UNITED STATES of America,
Plaintiff–Appellee,

v.

William L. SCHOLL, Defendant–
Appellant.

United States of America,
Plaintiff–Appellant,

v.

William L. Scholl, Defendant–Appellee.

Nos. 97–10143, 97–10248.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1998.

Submission Vacated Nov. 20, 1998.

Resubmitted Jan. 20, 1999.

Decided Jan. 27, 1999.

As Amended on Denial of Rehearing and
Suggestion for Rehearing En Banc
March 17, 1999.*

---

* Judge Rymer votes to reject the suggestion for rehearing en banc, and Judges Beezer and Hall so recommend.

Robert J. Hirsh and Jeffrey J. Rogers, Hirch, Bjorgaard & Rogers, P.L.C., Tucson, Arizona, for the defendant-appellant-cross-appellee.

Robert L. Miskell, Assistant United States Attorney, Tucson, Arizona, for the plaintiff-appellee-cross-appellant.

Before: BEEZER, HALL and RYMER, Circuit Judges.

RYMER, Circuit Judge:

William L. Scholl appeals his conviction in the district court on four counts of filing false tax returns in violation of 26 U.S.C. § 7206(1) and three counts of structuring currency transactions in violation of 31 U.S.C. § 5324. The government cross-appeals the district court's imposition of sentence. We affirm in each instance.

I

Scholl was a Superior Court Judge in Tucson, Arizona, from 1984 until he was indicted. He was a compulsive gambler who took numerous trips to Las Vegas to gamble. Throughout the 1980s, he gambled on credit lines established at various casinos. In 1989, he had outstanding balances on credit lines from six different casinos totaling $163,000. In the latter part of 1989 and the beginning

of 1990, Scholl settled his outstanding credit line balances, paying a total of $50,000. From that point through 1994, he continued to gamble as a cash player.

Once he became a cash player, Scholl would purchase a cashier's check from his checking account or bank credit line payable to the casino where he was staying. He would deposit the cashier's check in the cage of that casino upon his arrival and draw against his deposit to gamble at various casinos during the trip. After the end of the trip, he would withdraw his deposit in the form of cash and transport the cash back to Tucson. Records were not kept of these withdrawals.

Upon returning to Tucson, Scholl would put the currency into the gun safe at his house. When he went to work, he would take one bundle of $5,000 in his pocket. At lunch time, he would deposit the money into a bank. He was aware that currency forms may be generated when a person deposits more than $10,000 in currency at a bank, and part of the reason he broke up deposits into amounts less than $10,000 in currency was to avoid the preparation of those reports. Scholl made numerous deposits in various accounts that avoided the reporting requirements and, in addition, made sub-$10,000 deposits into a personal credit line that was his main account for gambling.

Scholl's accountant, Ken Silva, had a conversation with Scholl in 1987 in which he told Scholl that both gambling winnings and gambling losses must be reported separately on Scholl's tax return. Scholl's 1987 return reflected "gambling winnings" of $128,680 and an itemized deduction for "gambling losses" of $128,680. In connection with preparation of Scholl's 1988 tax return, Silva asked Scholl if he had any gambling winnings. Scholl responded that he did not have any, or that he had "lost his ass there." Scholl's tax returns for 1990 and 1993 do not reflect any gambling income or losses, and his returns for 1991, 1992, and 1994 reflect only small amounts. In each of those years, the only gambling income reported was gambling income of the type reflected on a Form W–2G, which he was required to file with the IRS.

Scholl testified to his belief that he could "net out" his gambling wins and losses in any particular year and, if losses exceeded wins, nothing needed to be reported on the return. He did not, however, "net out" gambling winnings that were reflected on Forms W–2G.

On December 5, 1995, a grand jury in Tucson, Arizona, returned an indictment charging Scholl with filing false tax returns for the years 1989 through 1994, in violation of 26 U.S.C. § 7206(1) (Counts 1 through 6), and five counts of structuring currency transactions to avoid the Treasury reporting requirements, in violation of 31 U.S.C. § 5324 (Counts 7 through 11). Trial to a jury began September 24, 1996. The court granted Scholl's motion for judgment of acquittal on Count 8. On November 19, the jury found Scholl guilty of counts 2, 3, 4, 6, 7, 9, and 10, but acquitted him on counts 1, 5, and 11. On February 27, 1997, the court sentenced Scholl to five years probation on each count, to run concurrently. Although Casino Market Analysis Center Reports and eyewitnesses indicated that Scholl had substantial unreported winnings, the district court did not find them a sufficiently reliable indicator of tax loss to make a reasonable estimate for purposes of determining Scholl's offense level under the Guidelines.

Scholl timely appeals his conviction. The government cross-appeals from sentence, challenging the district court's failure to calculate Scholl's offense level based on a reasonable estimate of tax loss.

## II

Scholl first argues that he was substantially prejudiced when the district court moved the trial from Tucson, where he lives, to Phoenix. His request for change of venue back to the Tucson division was denied. The denial of a motion for transfer should be overruled only if the district court abused its discretion. *United States v. Herbert,* 698 F.2d 981, 984 (9th Cir.1983). We see none here.

Federal Rule of Criminal Procedure 18 provides, in relevant part:

The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

The district court emphasized the convenience of a trial in Phoenix to witnesses (relying in part on the availability of more daily flights from Las Vegas to Phoenix than from Las Vegas to Tucson); the unavailability of a courtroom in Tucson to conduct the trial as scheduled; the effect such a transfer would have on resolution of pending motions and discovery issues in other matters; substantial pretrial publicity in Tucson; and the efficiency to be gained by not transferring the matter to another judge. On the other hand, Tucson was the site of the offense and the home of the defendant, counsel for both the government and Scholl, and most of the principal witnesses; Scholl had particularly weighty family obligations; and trial in Tucson imposed burdens of travel and expense that would not otherwise have existed. While we might have decided the matter differently, the court considered the relevant facts in applying the proper standard. As such we cannot say that the denial of the transfer was an abuse of discretion. *See United States v. McMullen,* 98 F.3d 1155, 1159 (9th Cir.1996), *cert. denied,* 520 U.S. 1269, 117 S.Ct. 2444, 138 L.Ed.2d 203 (1997) ("Under the abuse of discretion standard, an appellate court may not simply substitute its judgment for that of the lower court ...").

### III

Scholl maintains that he was unable to present a meaningful and truthful defense because the district court improperly and prejudicially limited the testimony of his compulsive gambling psychological expert; limited the number of character witnesses he was allowed to call; excluded evidence that would have laid the foundation for his compulsive gambling expert's testimony; excluded other defense evidence and witnesses;

and excluded Scholl's expert witnesses on accounting and tax law. We disagree.

### A

Scholl sought to have Dr. Robert Hunter, his expert on compulsive gambling, testify that pathological gamblers have distortions in thinking and "denial," which impact their ability and emotional wherewithal to keep records. He would have testified that compulsive gamblers do not want to keep records because that would force them to confront the reality of losses, which creates too much upheaval. Hunter also would have opined that a pathological gambler is not motivated by money, but believes that the next "big win" will fix their lives.

In a published opinion the district court applied the two-part analysis [1] set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See United States v. Scholl,* 959 F.Supp. 1189, 1194 (D.Ariz.1997). The court concluded that a diagnosis of compulsive gambling disorder satisfied the validity prong of *Daubert,* and ruled that Hunter could testify that Scholl was a compulsive gambler at the time the alleged crimes occurred. However, the court limited Hunter's testimony to the ten diagnostic criteria for pathological gambling set forth on page 618 of the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV), and excluded proffered evidence regarding distortion in thinking and denial of the existence of a gambling problem. Distortion and denial are "Associated Descriptive Features" but are not regarded as sufficiently sensitive or specific to be recognized as diagnostic criteria.

The district court also excluded the proffered testimony under Federal Rules of Evidence 402 and 403, noting among other things that Hunter said it was not his opinion that gamblers could not truthfully report on

---

1. "First, we must determine nothing less than whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to 'good science'.... Second, we must ensure that the proposed expert testimony is 'relevant to the task at hand,' ... i.e., that it

logically advances a material aspect of the proposing party's case. The Supreme Court referred to this second prong of the analysis as the 'fit' requirement." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1315 (9th Cir. 1995) (citations omitted).

their income tax returns. Hunter did not state that compulsive gamblers have no memory of what occurred when they prepare their tax returns. Accordingly the court ruled that Hunter's opinion on denial was not relevant and could be confusing, inconsistent, and misleading to the jury.

Meanwhile, we rendered decisions in *United States v. Morales*, 108 F.3d 1031 (9th Cir.1997), and *United States v. Bighead*, 128 F.3d 1329 (9th Cir.1997), upon which Scholl now relies to challenge the district court's limitations on Hunter's testimony. In *Morales*, we held that an accounting expert should not have been precluded from testifying that the defendant lacked bookkeeping competence because such an opinion does not go to the ultimate issue of intent, but rather to a predicate fact from which the jury may infer the necessary *mens rea*. 108 F.3d at 1037–38. In *Bighead*, we reiterated that *Daubert*'s test for the admissibility of expert scientific testimony does not require exclusion of expert testimony that involves specialized knowledge rather than scientific theory. 128 F.3d at 1330; *see also United States v. Cordoba*, 104 F.3d 225, 230 (9th Cir.1997) (noting *Daubert* test inapplicable to proffered expert testimony based upon specialized, not scientific, knowledge). Scholl contends that *Morales* makes it clear that Hunter's testimony should not have been limited, and that in any event the district court erred by subjecting his proffer to *Daubert* analysis because Hunter's testimony about characteristics of compulsive gamblers was based on his own observations over the years, just as the expert's testimony in *Bighead* concerning behavioral characteristics of child abuse victims was based on her own observations.

We need not decide on which side of the line the proffer falls because the district court did not abuse its discretion under either *Daubert* or *Bighead* in finding that Hunter's testimony had essentially no probative value but substantial risk of prejudicial effect, and should therefore be excluded under Rules 402 and 403. The court stated that Hunter's "expert testimony would not be helpful to the jury because there is no 'fit' between his testimony and the issue of willfulness in this case. 959 F.Supp. at 1197.

The court excluded Hunter's opinion regarding denial as "not relevant" pursuant to Rule 402 and "confusing, inconsistent and misleading" under Rule 403." *Id.*

At best, Hunter's opinion would have been that compulsive gambling disorder makes one believe that he has lost more money than he has won—not that it renders one unable to remember what occurred, or unable to enter both winnings and losses on a Form 1040. While Hunter was prepared to testify that Scholl could have misevaluated his winnings and losses and believed he was telling the truth, Hunter also acknowledged that there was no support in the literature for this opinion or for the idea that pathological gamblers cannot truthfully report gambling income. Indeed, Hunter made it clear that it was not his opinion that compulsive gamblers cannot truthfully report income on their tax returns. Thus, evidence that compulsive gamblers are in denial, or that their thinking about gambling in relation to their life is distorted, would not tend to show that Scholl did not believe his tax return to be correct in reporting winnings and losses, or that he did not falsely subscribe to it specifically intending not to report gambling wins and losses.

Likewise, the excluded characteristics do not tend to negate materiality because even if one truly believes he has lost more than he has won, the numbers should be reported as information about winnings and losses is necessary to determine whether income tax is owed. *See* 26 U.S.C. § 7206(1). Thus, as the district court concluded, the proffered opinion on denial is not relevant. In any event, had Hunter been allowed to testify as proffered, his opinion may have been mistaken to mean that Scholl lacked intent to report wins or losses because of his disorder. This conclusion would have been without support either in the scientific community or Hunter's own experience. It would therefore have been misleading and confusing. For these reasons, the district court had discretion under Rules 402 and 403 to limit Hunter's testimony to well-recognized characteristics of compulsive gamblers, and to exclude that portion of his proffered opinion which had slight (if any) relevance, and was both speculative and misleading. *See Morales*,

108 F.3d at 1035 (reviewing exclusion of expert testimony for abuse of discretion).

### B

■■■ Scholl also contends that the court erred in limiting him to three character witnesses in his case-in-chief on the footing that more would be cumulative.[2] Because a limitation on character witnesses is "left to the sound discretion of the judge," *Loux v. United States,* 389 F.2d 911, 917 (9th Cir.1968), and Scholl fails to present "exceptional and compelling circumstances clearly indicat[ing] an abuse of discretion" on the part of the district court, *United States v. Henry,* 560 F.2d 963, 965 (9th Cir.1977) (quoting *Wagner v. United States,* 416 F.2d 558, 564 (9th Cir.1969)), there was none here. *Id.* at 965 ("We resist the implication that the number of [character] witnesses rather than the quality of their testimony should determine the strength of argument.").

### C

Scholl contends that the district court improperly excluded defense evidence which would have laid the foundation for Hunter's testimony and evidence of his state of mind. First, he asserts that he was unable to explore the health problems of his children that were stressful to him. Plenty of evidence was admitted on this point and Scholl fails to identify any particular evidence that was improperly excluded. Secondly, Scholl contends his counsel was precluded from exploring with Mrs. Scholl discussions they had about gambling winnings and losses with respect to tax returns. However, the court ruled that these discussions were admissible. Counsel simply failed to pursue the line of inquiry after an objection was sustained to his lead-off question as leading.

### D

■■■ Scholl challenges the exclusion of copies of nine cashier's checks as a sanction for discovery abuse pursuant to Fed. R.Crim.P. 16.[3] In light of representations made earlier that a "full forensic financial audit" had been conducted and turned over, and the fact that counsel had possessed the records for some time, the court found that Scholl's failure to disclose the checks until after the jury was sworn was " 'a strategic decision to withhold the [evidence]' until the government would be unable to fully investigate." Our review is for abuse of discretion, *United States v. Duran,* 41 F.3d 540, 545 (9th Cir.1994), and we see none.

The evidence was not "of decisive value," nor was the exclusion "disproportionate to the conduct of counsel." *Id.* (quoting *United States v. Aceves-Rosales,* 832 F.2d 1155, 1157 (9th Cir.1987) (per curiam) (describing test)). Although the checks themselves were not entered into evidence, the information contained on the checks was. Scholl was permitted to use the checks to refresh his recollection. The court's determination that failure to disclose the checks was deliberate is supported in the record, and the sanction was directly related to the offending conduct.

### E

Scholl argues that the district court improperly disallowed the testimony of his proffered experts on tax and accounting law because *United States v. Brodie,* 858 F.2d 492 (9th Cir.1988), the opinion partially relied upon by the district court in excluding the

---

**2.** Two other witnesses testified to Scholl's good character during the government's case-in-chief.

**3.** Federal Rule of Criminal Procedure 16(b)(1)(A) provides:

If the defendant requests disclosure under subdivision (a)(1)(C) or (D) of this rule, upon compliance with such request by the government, the defendant, on request of the government, shall permit the government to inspect and copy or photograph books, papers, documents, ... which are within the possession, custody, or control of the defendant and which the defendant intends to introduce as evidence in chief at the trial.

The sanctions for failure to comply with this Rule are provided in Rule 16(d)(2):

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances....

testimony, has since been overruled by *United States v. Morales*, 108 F.3d 1031 (9th Cir.1997). Scholl's witnesses would have testified that Scholl's belief that he could "net out" his gambling wins and losses was reasonable because the law was confusing; that Scholl's record-keeping method met IRS standards; and about whether Scholl's accountant met the requisite standard of care in preparing Scholl's returns.

Although Scholl correctly points out that *Brodie* has been overruled in part, the portion of *Brodie* overruled by *Morales* is not the same part discussed by the district court in excluding Scholl's proffered experts. *Morales* overruled *Brodie*'s analysis of Federal Rule of Evidence 704(b). *See Morales*, 108 F.3d at 1038 ("We overrule *Brodie*'s Rule 704(b) analysis which is inconsistent with this holding."). Rule 704(b) applies only to expert witnesses "testifying with respect to the mental state or condition of a defendant," Fed.R.Evid. 704(b), but Scholl's experts were to testify regarding the confusing state of tax and accounting law—not as to Scholl's individual confusion. That portion of *Brodie* remains good law, as

> [i]t is well settled that the judge instructs the jury in the law. Experts "interpret and analyze factual evidence. They do not testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations."

*Brodie*, 858 F.2d at 496–97 (quoting *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986)).

■ Furthermore, testimony concerning the reasonableness of Scholl's belief that he could net out wins and losses calls for a legal conclusion. As such, it is inappropriate matter for expert testimony. *See Aguilar v. International Longshoremen's Union*, 966 F.2d 443, 447 (9th Cir.1992) (noting matters of law are for the court's determination, not that of an expert witness); *see also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir.1977) (expert testimony consisting of legal conclusions inadmissible).

Regardless, even though the tax expert personally may have believed that gambling wins and losses could be netted out before he researched the issue, he also acknowledged that the Form 1040 Instructions Manual specifically states: "You cannot offset [gambling] losses against winnings and report the difference." Instruction for Form 1040 (1990), at 16. In addition, the proffered experts had no personal knowledge of any predicate matter relating to Scholl's own ability to understand the legal principles involved in reporting his gambling activity on tax returns. This further distinguishes *Morales*, where the proffered accounting expert sought to opine that the defendant had a weak grasp of accounting principles to counter testimony by the government's witnesses that she had a good understanding of the bookkeeping process. Finally, the exclusion of this expert testimony did not prevent Scholl from pursuing the theory that he believed he did not have to report anything if he thought his wins exceeded his losses. The reasonableness of what Scholl said he believed is irrelevant; the only relevant issue is whether Scholl actually had this belief (thus negating intent), and on this issue Scholl's proffered experts had nothing to say. In sum, as the district court explained, this "expert's personal experience with the tax laws was not relevant, would be confusing, and the prejudicial effect outweighed the probative value."

■ Testimony as to whether Scholl's record keeping practices met IRS standards would not have "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," Fed.R.Evid. 702, because the jury did not need assistance in applying the legal standard declared by the court—that taxpayers must maintain such records as are sufficient to determine the amount of income and deductions required to be reported on tax returns.

■ Nor did the court abuse its discretion in limiting expert testimony about whether Scholl's accountant exercised the proper standard of care. Scholl had already introduced into evidence a document published by the American Institute of Certified Public Accountants entitled "Statements on Responsibilities in Tax Practice," which de-

tailed the "appropriate standards of tax practice outlining the extent of a CPA's responsibility to the clients, the public, the Government, and the profession," and had engaged in lengthy cross-examination of his accountant with respect to these guidelines and accounting standards of care in general. As the jury was provided with the governing standards and this testimony, the court did not abuse its discretion in determining that additional expert testimony would be a waste of time and would not assist the jury to understand the evidence or determine a fact in issue. *See* Fed.R.Evid. 403.

## IV

■ Scholl contends that there was pervasive prosecutorial misconduct throughout the trial requiring reversal across the board. Specifically, he argues that the district court erred in denying his motion for mistrial based on misconduct in the government's cross-examination of character witnesses, Mrs. Scholl, and Scholl himself, as well as in the government's opening statement and closing argument.[4] Denial of a motion for mistrial based on allegation of prosecutorial misconduct is reviewed for abuse of discretion. *See United States v. Davis*, 932 F.2d 752, 761 (9th Cir.1991). "[T]he court should not reverse a defendant's conviction if substantial, independent and credible evidence of the defendant's guilt overwhelms whatever incriminating aspects inadmissible statements may have had in isolation." *Id.* (internal quotations omitted).

## A

■ Relying on *Michelson v. United States*, 335 U.S. 469, 482, 69 S.Ct. 213, 221–

22, 93 L.Ed. 168 (1948), Scholl first contends that the use of a "Did you know ... ?" form of question instead of "Have you heard ... ?" in cross-examination of character witnesses was improper. This argument is without merit because Federal Rule of Evidence 405, enacted after *Michelson*, informs the methods by which character may be proven and challenged. Rule 405(a) provides that "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." Fed.R.Evid. 405. The Advisory Committee Notes emphasize that the distinction between asking an opinion witness "whether he knew" and "whether he had heard" is

> of slight if any practical significance, and the second sentence of subdivision (a) eliminates them as a factor in formulating questions. This recognition of the propriety of inquiring into specific instances of conduct does not circumscribe inquiry otherwise into the bases of opinion and reputation testimony.

Fed.R.Evid. 405, Adv. Comm. Notes.

■ Scholl also faults the government's cross-examination of Judge Lacagnina, a character witness who had testified that Scholl's "integrity is beyond question," regarding his knowledge of a $10,000 loan Scholl had accepted from an attorney who was counsel in a case over which Scholl presided while the loan was outstanding without disclosing it to all parties. In Scholl's view the question was improper because the government's characterization of the loan was unfair and misleading, as the case was "nonadversarial." The judge's attention was called to the Arizona Code of Judicial Conduct,[5] but the court limited further inquiry

---

4. The questions that Scholl calls prosecutorial misconduct are mainly in areas deemed permissible by the district court. We treat Scholl's citations as he does, as instances of prosecutorial misconduct rather than as arguably erroneous rulings on evidence. Nevertheless we are mindful of Scholl's overarching argument that the entire trial was infected by prosecutorial misconduct and judicial bias. As we explain in connection with each of his specific arguments, however, we do not see the court's admission of any particular statement as reversible error in light of the overall evidence of Scholl's guilt.

5. Arizona Supreme Court Rule 81 codifies Canon 4 of the Arizona Code of Judicial Conduct, which provides, in relevant part:

> D. Financial Activities, ...
> (5) A judge shall not accept ... a gift, bequest, favor or loan from anyone except for: ...
> (h) any other gift, bequest, favor or loan, only if: the donor is not a party or other person who has come or is likely to come or whose interests have come or are likely to come before the judge; ...

17A Ariz.Rev.Stat. Sup.Ct. Rules, Rule 81, Canon 4(D).

once the witness responded that the rule did not cover this situation. The questioning itself was not prosecutorial misconduct.

Scholl further cites as misconduct the cross-examination of Judge Lacagnina regarding charges brought by the Arizona Commission on Judicial Conduct, which included filing a false state financial disclosure form. However, the inquiry was relevant because the judge had testified to Scholl's truthfulness, honesty and integrity, and the government had a good faith basis for asking the questions given the publicly-filed Statement of Charges. While Judge Lacagnina was asked whether his opinion would be affected if the information in the Commission's complaint regarding Scholl's false statements on the state financial disclosure forms was shown to be true, the question did not assume Scholl's guilt on any of the counts in the indictment.

Next, Scholl argues that cross-examination regarding Scholl's attendance and vacation time was misconduct. No such inquiry was made on cross-examination, although on re-direct Scholl's counsel asked Judge Lacagnina if he had formed an opinion "as to whether defendant was doing his job." The witness responded that Scholl was a good judge, and talked about the work he put out and the quality of that work. On re-cross, and with permission of the court, the AUSA asked Lacagnina if he had heard that the Chief Judge of the Juvenile Court believed that Scholl had abused the attendance and vacation policies of the court. Although this strayed somewhat from the relevant character traits at issue in this trial, it was equally irrelevant for Scholl's counsel to inquire whether Scholl was "doing his job." In any event, this falls well short of being sufficiently prejudicial to warrant reversal. To the extent that Scholl suggests there was no basis for the government's belief that the Chief Judge's comments about his attendance had been discussed in the relevant community, Judge Lacagnina merely testified to his opinion, not to Scholl's reputation, so knowledge in the community was not a material predicate to that testimony.

Finally, Scholl argues that asking character witnesses whether they had heard that Scholl believed himself to be a compulsive gambler was improper because it had nothing to do with his character and the government had no good faith basis to believe that any of this had been discussed in the relevant community. However, Scholl could not have been prejudiced by this line of questioning because he himself invoked his compulsive gambling disorder in his defense, and his counsel said in opening statement that Scholl never concealed the disorder.

### B

The government questioned Mrs. Scholl about the two houses the Scholls owned, a time-share in Hawaii and membership in the Oro Valley Golf Club. Scholl argues that these questions were appeals to class prejudice and therefore prosecutorial misconduct. However, Scholl's defense centered on his belief that he was losing more money gambling than he was winning. Although marginal, the evidence adduced was probative of whether he actually held that belief and it was not misconduct for the government to elicit it.

Scholl's more serious complaint is that by precluding Mrs. Scholl from testifying as to the reasons for the purchase of the house next door, the court allowed the government to convey the false impression that the Scholls had purchased it simply because they were wealthy. In fact, Mrs. Scholl would have testified that the house was purchased to rent to a full-time caretaker for their disabled son. Even so, while the reason for purchasing the second property might have painted a more sympathetic picture for Scholl, it is the fact of the purchase, not the reason for it, that had probative value. If there were error, it was harmless and in any event, there was no reversible misconduct.

### C

Scholl makes a number of loosely-connected misconduct charges about his own cross-examination. We treat these most summarily, because neither singly nor cumu-

latively do they constitute misconduct. Scholl opened the door to questions about how compulsive gambling affected his ability to follow the Canon of Judicial Ethics and act as a judge by contending that his gambling had not interfered with his work. Questions regarding when he disclosed his compulsive gambling problems were properly responsive to Scholl's position that he was "open as far as discussing [his] gambling activity." And questions about loans that he failed to disclose on his state financial form were relevant to credibility.

■■■■■ Scholl's own statement that the propriety of his actions would be decided by the Commission on Judicial Conduct paved the way for the government to ask, with the court's permission, about Scholl's motivation to testify in a way that would affect the pending proceedings before the Commission. This did not have to do with the verdict in the criminal case, but with Scholl's testimony. Nor, contrary to Scholl's argument, did the government impermissibly suggest that he would return to the bench if not convicted. Regardless, the court instructed the jury that the decision of the Commission "is completely separate from the resolution you will make by verdict in this case." Finally, questions regarding why Scholl did not provide information to the government were not misconduct running afoul of *Doyle v. Ohio,* 426 U.S. 610, 617–20, 96 S.Ct. 2240, 2244–46, 49 L.Ed.2d 91 (1976), because Scholl claimed that he was never given the opportunity to present documents or cooperate as he had requested. *See McMillan v. Gomez,* 19 F.3d 465, 469–70 (9th Cir.1994) (determining no *Doyle* error where prosecution refuted impression that defendant was cooperative by asking about later noncooperation).

■■■■■ Scholl contends that eliciting evidence from Mike Grayson regarding a prior bad act was misconduct. Grayson told an IRS investigator that he had seen Scholl win as much as $100,000 at a craps table at the Desert Inn, possibly in 1988 but most likely in 1990. The morning Grayson was to testify he told the IRS agent that based on further research he now believed the incident had occurred in 1986 or 1987. The court allowed Grayson to testify pursuant to Federal Rule

of Evidence 404(b). This decision was not improper. *Cf. United States v. Conforte,* 624 F.2d 869, 875–76 (9th Cir.1980) (holding that a pattern of understatement of income in successive years is evidence of willfulness in a tax prosecution). Although Rule 404(b) requires pretrial disclosure of such evidence, that requirement may be excused "for good cause shown." Fed.R.Evid. 404(b). The court properly concluded that good cause was shown because, prior to trial, the government believed that the incident had occurred in 1990, not 1986. This was not an abuse of discretion, nor was it misconduct for the government to seek to introduce Grayson's testimony or to ask for relief from the pretrial disclosure requirement.

■■■■■ Finally, Scholl submits that the AUSA committed misconduct in his examination of Richard Bock by asking whether Bock had discussed with Scholl the circumstances that led Scholl to be transferred to the juvenile court. Whether or not this line of questioning was proper, no prejudicial information was elicited. Bock testified that he did not believe that Scholl ever told him why he was transferred to juvenile court.

### D

Scholl faults the AUSA for having said during his opening statement that Scholl could not prove that compulsive gambling was relevant to the case, knowing that the court had excluded such evidence. This is not quite correct, as the court had merely precluded Scholl's compulsive gambling expert from testifying to characteristics that the expert himself said did not affect the ability to report winnings or losses truthfully on a tax return. Essentially the same point underlies Scholl's submission of misconduct in closing argument, and it fails for the same reason.

### V

Scholl argues that pervasive judicial bias against him and favoritism toward the government denied him a fair trial.

## A

■ Scholl first challenges Judge Silver's decision not to recuse herself. Scholl contends that Judge Silver, a former Assistant United States Attorney, should have recused herself pursuant to 28 U.S.C. § 455(b)(3), which directs a judge to disqualify himself "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding ..." 28 U.S.C. § 455(b)(3). We review the denial of a motion to recuse for abuse of discretion. *See United States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir.1997).

■ Scholl relies on *United States v. Arnpriester*, 37 F.3d 466, 467–68 (9th Cir. 1994), where we held that a judge who had been United States Attorney (and as ·such was responsible for the entire office) should have recused himself in a case under investigation during his tenure. Scholl's reliance is unwarranted. Judge Silver was an Assistant · United States Attorney from 1980 through October 7, 1994, and for much of that time was the Chief Criminal Assistant to the United States Attorney. However Judge Silver did not have supervisory power over the section of the office that investigated Scholl; she supervised only investigations in the Phoenix division, while the investigation of Scholl was performed by the Tucson division. Thus, *Arnpriester* does not require recusal and Judge Silver did not abuse her discretion in refusing to recuse herself.

## B

■ Scholl later filed a motion for disqualification pursuant to 28 U.S.C. § 144, identifying ten bases that he contends showed that Judge Silver had a bent of mind against the defense and in favor of the government.[6] On appeal, Scholl argues that Judge Silver was required to refer the motion to another judge instead of ruling on it herself, as she did. We disagree, as the § 144 affidavit was neither timely nor sufficient to trigger reassignment. *See Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1388 (9th Cir.1988) (holding that only after determining the legal sufficiency of a § 144 affidavit is a judge obligated to reassign decision on merits to another judge). It was filed less than 10 days before trial, and relied on the judge's prior service as an Assistant United States Attorney, which we have already explained did not require recusal, and actions taken by Judge Silver during the proceedings, which are not a proper ground for disqualification.

## C

■ Nor does the remainder of Scholl's list of incidents warrant a new trial. A federal judge has broad discretion in supervising trial, and her behavior during trial justifies reversal only if she abuses that discretion. "A trial judge is more than an umpire, and may participate in the examination of witnesses to clarify evidence, confine counsel to evidentiary rulings, ensure the orderly presentation of evidence, and prevent undue repetition." *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir.1988). "A judge's participation justifies a new trial only if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality." *Id.* We have reviewed the record, and here as in *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the grounds Scholl complains of mainly

> consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel and to witnesses. All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowl-

---

6. These included the judge's mistreatment of previous defense counsel; requirement that previous defense counsel file affidavits in support of factual assertions; suggestion that Scholl should have hired Phoenix counsel to obviate Rule 18 problems; defense claims that Scholl's daughter's necessity to wear a pacemaker and had special needs were suspect because she was a high school golfer; general failure to address issues of

government misconduct; changes in transcript of record made by the court reporter and recognized by the court; handling of Scholl's request for CJA appointment and Rule 17(b) request; permission to allow discovery of Scholl's expert and failure to require the government to pay expert's travel expenses; pretrial threats of imposition of sanctions; and issues relating to bias of Judge Silver's bailiff.

edge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible. 510 U.S. at 556, 114 S.Ct. 1147 (italics in original). Judge Silver's judicial rulings and efforts at trial administration are an inadequate basis for disqualification.

■ There is one exception, having to do with the judge's mouthing "stand up" to the AUSA during defense counsel's closing argument. However, this was adequately explained by Judge Silver as intended to communicate that if counsel wanted to make an objection like he looked like he wanted to do, he should stand up. There is no indication the gesture was visible to or seen by the jury. While all communications with counsel should be audible instead of inaudible, the judge's reaction was an understandable, if regrettable, effort to avoid interrupting defense counsel's closing argument that we cannot say warrants reversal, for nothing suggests it had anything to do with the outcome.

### VI

■ Scholl contends that the court improperly admitted Market Analysis Center (MAC) reports prepared by casinos to establish amounts allegedly won or lost by Scholl and the source of money he allegedly structured. The MAC reports were received under the business records exception to the hearsay rule, Fed.R.Evid. 803(6). The district court has "wide discretion" in determining whether a business record meets the trustworthiness standard, *United States v. Olano*, 62 F.3d 1180, 1206 (9th Cir.1995) (citations omitted), and did not abuse its discretion here.

MAC reports are prepared by a floor worker at the casino that serve as estimates of particular gamblers' winnings or losses. Generally, the floor worker keeps track of cash or chips that the gambler has when he arrives at the table, records the average bet made by the gambler, and, to the extent possible, keeps track of how much money the gambler is winning or losing. Typically, this information is used by the casino to determine the amount of complimentary services to give the gambler.

■ Scholl argues that these reports should be inadmissible under Rule 803(6) because they are rough estimates and insufficiently trustworthy. However, a party need not prove that business records are accurate before they are admitted. "Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence." *United States v. Keplinger*, 776 F.2d 678, 694 (7th Cir.1985); *see also La Porte v. United States*, 300 F.2d 878, 880 (9th Cir.1962) (noting "the admissibility of a document, as distinguished from its weight, normally does not depend upon either completeness or freedom from ambiguity").

Discussing the policy behind Rule 803(6) in *United States v. Licavoli*, 604 F.2d 613 (9th Cir.1979), we explained:

> The focus of the business records exception to the hearsay rule is on the requirements that the record be made in the course of and as a regular practice of a regularly conducted business activity.... There are circumstantial guarantees of trustworthiness in a record contemporaneously prepared by one who acts under a business duty of care and accuracy, particularly when the business entity for which the record is made relies on it.

*Id.* at 622 (citations omitted). In this case, the government established that the records were made at or near the time of the activity reflected in the records, made by a person with knowledge based on their observations, kept in the ordinary course of business, and made as part of the regular practice of the casinos' operations. Hence, the Rule 803(6) requirements were fulfilled.

To be sure the records are merely estimates, and crude ones at that. However, as the Tenth Circuit held in a § 7206(1) case involving failure to report gambling income, estimates or averages given by witnesses are sufficient to demonstrate a substantial understatement in the wagers reported by a defendant. *See United States v. Hallmark*, 911 F.2d 399, 402 (10th Cir.1990). Here as in *Hallmark*, the government "did not have to prove the exact amount by which [the defendant] misstated the tax returns; the witness'

[estimates] demonstrated substantial understatements in the wagers he reported." *Id.*

Furthermore, Scholl had the opportunity to attack the reliability of the MAC reports at trial and did so. The jury was informed that the reports were mere estimates. Given that the records are trustworthy for what they are—estimates—and that Scholl was permitted to elicit testimony going to their questionable accuracy, and we conclude that the MAC reports were properly admitted into evidence.

## VII

### A

 Scholl contends that his § 5324 convictions must be vacated because the government submitted no proof that he knew the alleged structuring was illegal. To violate 31 U.S.C. § 5324, a defendant must (1) intentionally structure financial transactions, (2) with the purpose of avoiding the currency reporting requirements, and (3) with the knowledge that the conduct is unlawful. *See Ratzlaf v. United States*, 510 U.S. 135, 136–37, 114 S.Ct. 655, 657, 126 L.Ed.2d 615 (1994). Willfulness rarely can be proved by direct evidence that the defendant knew of the illegality of structuring; instead, it is usually established by drawing reasonable inferences from the available facts. *United States v. Tipton*, 56 F.3d 1009, 1012 (9th Cir.1995) (citations omitted). A jury may find the requisite knowledge that the structuring was unlawful by drawing reasonable inferences from the evidence of defendant's conduct. *Id.* at 1012–13 (quoting *Ratzlaf*, 510 U.S. at 149 n. 19, 114 S.Ct. 655).

 The evidence at trial, viewed in a light most favorable to the prosecution, allowed a rational factfinder to infer Scholl knew that structuring his deposits was illegal. Scholl admitted that he was aware financial institutions must report currency transactions of $10,000 or more, and that he divided his deposits into amounts less than $10,000 "in part" to avoid triggering this requirement. Whenever Scholl made two deposits on the same day, he made the deposits at different banks. By using different banks, he concealed from each bank the fact

that he was making multiple deposits. Furthermore, virtually all of Scholl's deposits were in amounts of $5,000 or less. Thus, Scholl was making more than the minimum number of deposits necessary to avoid the reporting requirements. *See United States v. Beidler*, 110 F.3d 1064, 1070 (4th Cir.1997) ("Based upon the fact that Beidler made more deposits than the minimum necessary to evade the reporting requirements, the jury reasonably could have inferred that Beidler intended to conceal his structuring because he knew structuring was illegal.")

 Furthermore, a "jury may infer knowledge of the law from a defendant's education and expertise." *See United States v. Simon*, 85 F.3d 906, 910 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 517, 136 L.Ed.2d 406 (1996) (§ 5324 structuring transaction of a licensed stockbroker). Given Scholl's legal training, career on the bench, and the credibility of his testimony, the jury rationally could have disbelieved Scholl's testimony that he did not know structuring was illegal. *See United States v. Kenny*, 645 F.2d 1323, 1346 (9th Cir.1981) ("When the defendant elects to testify, he runs the risk that if disbelieved, the trier of fact may conclude that the opposite of his testimony is the truth.") (citations omitted). Thus, while not overwhelming, there is sufficient evidence in the record from which a reasonable factfinder could conclude, by drawing permissible inferences, that Scholl knew his structuring activity was illegal.

### B

 Scholl contends that there was insufficient evidence of materiality to sustain a conviction under § 7206(1). The elements of a violation of 26 U.S.C. § 7206(1) are: (1) the defendant made and subscribed a return, statement, or other document that was incorrect as to a material matter; (2) the return, statement, or other document subscribed by the defendant contained a written declaration that it was made under the penalties of perjury; (3) the defendant did not believe the return, statement, or other document to be true and correct as to every material matter; and (4) the defendant falsely subscribed to

the return, statement, or other document willfully, with the specific intent to violate the law. *See United States v. Marabelles,* 724 F.2d 1374, 1380 (9th Cir.1984). Whether there was an actual tax deficiency is irrelevant because the statute is a perjury statute. *See United States v. Marashi,* 913 F.2d 724, 736 (9th Cir.1990).

Since Scholl's trial, we considered the materiality requirement of § 7206(1) in light of the Supreme Court's decision in *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), in *United States v. Uchimura,* 125 F.3d 1282 (9th Cir. 1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 151, 142 L.Ed.2d 123 (1998). There we held that, for purposes of § 7206(1), "information is material if it is necessary to a determination of whether income tax is owed." 125 F.3d at 1285. We also noted that materiality necessarily depends on the facts of each case. *Id.*

■ The Internal Revenue Service must be able to measure gambling income against gambling losses in order to determine whether income tax is owed. When gambling income and losses are both knowingly omitted, a reasonable jury could conclude that the information was necessary to a determination of whether income tax is owed. Whether Scholl believed (correctly or incorrectly) that he had lost more than he had won is irrelevant. *See United States v. Holland,* 880 F.2d 1091, 1096 (9th Cir.1989) (holding "any failure to report income is material"). As there is no dispute that Scholl failed to report winnings and losses, in this case that evidence suffices to show that the return was not correct as to a material matter.

## VIII

Scholl contends that he was prejudiced by two improper jury instructions: (1) the materiality instruction that he argues improperly took the issue from the jury; and (2) the instruction on recordkeeping that he asserts created a strict liability guilt assumption in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

## A

■ Section 7206(1) makes it a crime for a person to file a tax return "which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1). Consistent with *Gaudin,* the district court submitted the element of materiality to the jury. The instruction read as follows:

The tax return must be false as to a material matter. To be material, the statement must have a natural tendency to influence, or to be capable of influencing, the decision making body to which it is addressed.

If you find the defendant made a false statement on his tax return relating to gross income, regardless of the amount, that is to say, if you find that the defendant received income in addition to that reported on his tax return, regardless of the amount, such omission of income is a material matter.

Scholl did not object to the definition of materiality.[7]

Scholl argues that although the issue of materiality was given to the jury (as it should have been under *Gaudin* ), the instruction was tantamount to instructing the jury that *any* omission of income was material as a matter of law. This, he submits, is no longer the law of the Ninth Circuit in light of *Uchimura,* which noted that

just because a jury usually would agree with [the statement in *Holland* that 'any failure to report income is material'] does not mean that a jury must agree with it, as a matter of law. Even if any failure to report income is material in most circumstances, it is not necessarily material in all circumstances, since the materiality of an underreporting of income necessarily depends on the facts of each case.

*Uchimura,* 125 F.3d at 1285–86. Yet as we have already explained, on the facts of this case there is no dispute that Scholl won and lost but failed to report what he won or what he lost. In *United States v. Knapp,* as here, where the defendant failed to object to the materiality error, "[t]o warrant reversal in a

---

7. Scholl requested a substantiality instruction but does not argue that its rejection was error.

Rather, he focuses on the absence of an instruction consistent with *Uchimura* as he reads it.

case where a *Gaudin*-type error is made, the error must 'seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *United States v. Knapp*, 120 F.3d 928, 933 (9th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 417, 139 L.Ed.2d 319 (1997) (citations omitted). *Knapp* dealt with the very similar situation of taking from the jury's consideration the element of materiality of a filing false currency report charge, and held it was not reversible error because the evidence of materiality in the defendant's failure to report properly several transactions in excess of $10,000 was overwhelming. In this case, as in *Knapp*, the evidence of materiality in Scholl's failing to report money he lost or money he won was overwhelming, thereby precluding reversal.

### B

 Over Scholl's objection, the jury was instructed that

> [a]n individual is required to keep such records as are sufficient to establish the amount of gross income (other than gross income from wages and salary) and deductions required to be shown on a tax return.

Scholl contends that this creates a "strict liability guilt assumption" in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). This argument also fails. None of the charged crimes involves a failure to keep records, nor would the keeping of adequate records have exonerated Scholl had he nonetheless violated § 7206(1). Therefore the burden of proof was not shifted nor was the government relieved of its obligation to prove beyond a reasonable doubt every fact necessary to constitute the crime charged. *See In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

### CROSS–APPEAL

### IX

 The government contends that the district court erred by failing to make a reasonable estimate of tax loss in calculating Scholl's offense level. Under U.S.S.G. § 2T1.1(a), the offense level for filing false tax returns is either the level from the tax table (§ 2T4.1) corresponding to the tax loss, or level 6 if there is no tax loss. Where the tax loss is uncertain, the court shall "make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1, comment (n.1).

At sentencing, the district court found it could not make a reasonable factual estimate of any tax loss and imposed an offense level of 6. The government argues that the district court should have relied on casino records or, alternatively, testimony concerning unchallenged gambling winnings to calculate the tax loss. Scholl responds (and the record reflects) that the court attempted to make such a determination but, after review of the evidence, found that no reasonable estimate could be made.

We cannot say that this was clearly erroneous. The evidence showed that Scholl failed to report both gambling income and gambling losses. This was a material misstatement, and the jury found that this misstatement was willful. These findings support a conviction under § 7206(1). However, the jury was not required to find how much of a misstatement it was. The court was free to do so, and to find that there was insufficient evidence to make a reasonable estimate of tax loss. Nor can we say that the court erred in finding that Grayson's testimony as to when one of the big wins occurred was speculative, or that, with respect to the second win, other evidence indicated losses in that same year exceeded the size of the win. Given that the record does not compel a finding of a reliable estimate of the magnitude of any tax loss that occurred as a result of Scholl's gambling activity and false tax returns, the district court did not err in determining that no reasonable estimate could be made or in applying the Sentencing Guidelines as it did.

AFFIRMED.