Benter Hernist SANA, guardian ad litem for Peter Hernist Sana, Plaintiff–Appellant,

v.

HAWAIIAN CRUISES, LTD.; Island Navigation, Co.; Bank of Hawaii, In Personam; M/V Navatek I, O.N. D953302, its engines, boilers, tackle, freight, equipment, stores and furnishings In Rem, Defendants–Appellees.

No. 98–15077.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 29, 1999.

Decided June 4, 1999.

Jay Friedheim, Honolulu, Hawaii, for the plaintiff-appellant.

Michael D. Formby and Robert G. Frame, Alcantara & Frame, Honolulu, Hawaii, for the defendants-appellees.

Before: FARRIS, NOONAN and GRABER, Circuit Judges.

FARRIS, Circuit Judge:

Peter Sana appeals from the judgment in favor of Hawaiian Cruises, Ltd. on his claim for maintenance and cure. We reverse.

## BACKGROUND

On January 5, 1995, Hawaiian Cruises hired Sana to work in the galley aboard the Navatek I, a vessel used for whale-watching cruises. He typically worked from 6:30 a.m. to 2:30 p.m. on certain assigned days, and he could be called to work additional shifts on short notice.[1] On March 9 and 10, 1995, Sana worked a normal shift. He did not report any accident or illness, and his manager Jenny Curry observed nothing unusual about his appearance or behavior.

After Sana left work on March 10, he ran into his father, Hernist. Hernist noticed that Sana was walking differently and that Sana's hands were "shivering or shaking." Hernist also observed swelling and a scratch right at Sana's hairline. Sana told him that he had bumped his head at work.

On March 11, Sana became very ill at a church event. When his brother Benter arrived to pick him up, he was unresponsive. Benter took him to the Straub Clinic, where doctors performed a CAT scan. The result was negative for head trauma, and Sana was released.

Later that evening, Sana's behavior became increasingly bizarre. He was unable to sit still or sleep, his body shook, and he laughed inappropriately. On March 12, Benter informed Hawaiian Cruises that Sana was sick and could not work that day. On March 13, Sana's condition deteriorated. His family called an ambulance, and Sana was taken to Pali Momi Hospital. Hospital workers noted confused behavior, hysteria, and seizures, and they transferred Sana to the Straub Clinic.

At the Straub Clinic, Dr. James Pearce, a neurologist, gave Sana an EEG. This test showed that Sana's brain function was slowing. Further testing revealed leukocytosis, which to Pearce indicated a viral or bacterial brain infection. Dr. Pearce consulted Dr. Francis Pien, an infectious disease specialist, who initially agreed with Pearce's diagnosis. As Sana's condition worsened, the doctors performed additional tests, including a brain biopsy. None of the tests revealed the presence of a virus, fungus, or bacterium. Thus, the doctors could not determine definitively the cause of Sana's brain inflammation. On March 16, Sana slipped into a coma, in which he remains to this day.

At trial, Dr. Pearce opined that Sana had viral encephalitis. He concluded that Sana was suffering from this illness while he was working on March 9 and 10. Dr. Pearce based this opinion on Sana's shaking, weakness, and behavioral changes. Dr. Pien refused to speculate about what had caused Sana's encephalitis, because none of the tests was conclusive. He also refused to speculate about the time at which Sana first fell ill. Dr. Maurice Nicholson, Hawaiian Cruises' expert, testified that it was impossible to determine when Sana was infected.[2] He also stated that Sana could have been infected at the church event on March 11. None of the doctors believed that the blow to Sana's head caused his illness.

On August 8, 1995, Sana's counsel sought from Hawaiian Cruises the traditional maritime remedies of maintenance and cure. After conducting an investigation, Hawaiian Cruises refused the request. On October 3, 1996, Sana filed a complaint seeking maintenance and cure, as well as damages for negligence and unseaworthiness under the Jones Act. On October 22, 1996, Hawaiian Cruises filed an answer, and on January 14, 1997, it

---

1. The parties dispute whether Sana could refuse such requests without losing his job.

2. According to Dr. Nicholson, in over 50% of the cases of encephalitis the cause is never determined.

sought to amend its answer by pleading a limitation of liability under 46 U.S.C. § 183(a). Over Sana's objection, the court granted Hawaiian Cruises leave to amend.

At trial, Sana attempted to call Don Beaudry, the president of Hawaiian Cruises' insurance company. A Beaudry Insurance agent named Michael Rutherford had investigated Sana's behavior on March 9 and 10. Rutherford's report contains transcripts of his interviews with two of Sana's co-workers, Christopher Kalani Kauhi and Saver Ruben, and with Sana's immediate supervisor John Michael Hudson. In the interviews, which took place a few days after Sana was admitted to the Straub Clinic, both Kauhi and Ruben state that Sana told them that he had bumped his head at work on March 10. Kauhi also claims that Sana was behaving abnormally that day. Hudson states that Sana told him that he felt sick on March 8. Since neither Rutherford nor Sana's co-workers were available to testify at trial, Sana hoped to establish through Beaudry that the Rutherford report was an admissible business record.

The court held that the Rutherford report contained inadmissible hearsay, and it refused to let Beaudry testify. On the merits, it credited the testimony of Drs. Pien and Nicholson.[3] The court concluded that Sana did not prove that his illness manifested itself on or before March 10, 1995, his last day of work. Therefore, he was not entitled to maintenance and cure. The court also denied Sana's Jones Act claims.

Sana timely appealed the denial of his maintenance and cure claim. He argues that the court erred by (1) excluding the Rutherford report, (2) holding that Sana was not answerable to the call of duty after he left work on March 10, and (3) allowing Hawaiian Cruises to amend its answer to plead a limitation of liability.

3. Sana had waived his right to a jury trial.

## STANDARD OF REVIEW

We review a trial court's rulings on the admissibility of evidence for abuse of discretion. *See United States v. Arias–Villanueva,* 998 F.2d 1491, 1503 (9th Cir. 1993). We review findings of fact for clear error. *See Resner v. Arctic Orion Fisheries,* 83 F.3d 271, 274 (9th Cir.1996). We review whether the doctrine of maintenance and cure applies to a given set of facts *de novo. See Stevens v. McGinnis,* 82 F.3d 1353, 1356 (6th Cir.1996).

## DISCUSSION

"[A] seaman who falls ill while in the service of his vessel is entitled to ... maintenance and cure." *Dragich v. Strika,* 309 F.2d 161, 163 (9th Cir.1962) (seaman who evidenced signs of Parkinson's disease aboard fishing vessel entitled to maintenance and cure). The obligation does not depend on the negligence or fault of the shipowner, nor is it limited to cases in which the seaman's employment caused his illness. *Id.* Traditionally, courts have construed this obligation liberally. *See, e.g., Aguilar v. Standard Oil Co.,* 318 U.S. 724, 735, 63 S.Ct. 930, 87 L.Ed. 1107 (1943) (obligation should "not be narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes").

### I. Did Sana fall ill while "in the service of his vessel"?

Sana argues that he experienced symptoms of encephalitis while he was still working on the Navatek I. Assuming that the court properly excluded the Rutherford report, Sana's only evidence to support this proposition is Dr. Pearce's opinion that he was infected by March 9. The court rejected this testimony, and it accepted the view of Drs. Pien and Nicholson that the origin and onset of the infection were impossible to determine. This resolution of the medical testimony was not clearly erroneous.

If the Rutherford report is admissible, Sana has a much better case. Hudson's statement establishes that Sana felt ill as early as March 8. Kauhi's statement shows that Sana was behaving abnormally on March 10. Taken together, these statements bolster Dr. Pearce's testimony that Sana was infected by March 9.

In *Stevens*, 82 F.3d at 1353, the Sixth Circuit affirmed a grant of maintenance and cure on similar facts. Stevens suffered a blow to the head when he fell on the deck of a towboat. According to a co-worker, Stevens suffered headaches for months, and his personality changed. The shipowner eventually fired him for threatening the same co-worker. Five months later, Stevens was diagnosed with a brain tumor. Both the district court and the Sixth Circuit concluded that he became sick while in the ship's service. Therefore, he was entitled to maintenance and cure.

Like Stevens, Sana exhibited the first signs of a severe illness while at work. Unlike Stevens, Sana deteriorated very shortly thereafter. This proximity makes Sana's case even stronger. In light of the inconclusive medical testimony presented by Hawaiian Cruises and the traditional liberality of the maintenance and cure remedy, the court's exclusion of the Rutherford report materially affected Sana's case.

## II. Did the court abuse its discretion in excluding the Rutherford report?

The Rutherford report involves several layers of hearsay: (1) it is an unsworn, out-of-court statement by Rutherford; (2) it contains unsworn, out-of-court statements by Sana's co-workers; (3) which recall unsworn, out-of-court statements by Sana. For the document to be admissible, each layer of hearsay must satisfy an exception to the hearsay rule. *See* Fed. R.Evid. 805.

■ Sana argues that his statements to his co-workers are admissible under Fed. R.Evid. 803(3), which excepts from the hearsay rule statements "of the declarant's then existing ... physical condition (such as ... pain ... and bodily health)." Hawaiian Cruises simply denies, without explanation, that this section applies. It is mistaken. The statements are admissible under Rule 803(3).

■ Sana argues that his co-workers' statements to Rutherford are admissions by a party-opponent under Fed.R.Evid. 801(d)(2)(D). Rule 801(d)(2)(D) provides that "[a] statement is not hearsay if [it] is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment." The question is whether the statements of Kauhi, Ruben, and Hudson concerned a matter "within the scope of [their] employment." [4]

Sana notes that his co-workers spoke to Rutherford while they were at work. He also points out that Hawaiian Cruises had a duty to investigate his injuries. *See Vaughan v. Atkinson*, 369 U.S. 527, 530–31, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (shipowner liable for attorney's fees for "callous" failure to investigate a claim for maintenance and cure); *see also Harper v. Zapata Off-Shore Co.*, 563 F.Supp. 576, 581 (E.D.La.1983), *rev'd on other grounds*, 741 F.2d 87 (5th Cir.1984) (instructing jury that employer has a duty to investigate maintenance and cure claim in good faith). Sana contends that because Hawaiian Cruises had to investigate his claim, the cooperation of its employees was within the scope of their employment.

■ Hawaiian Cruises argues that Sana failed to prove that Kauhi, Ruben, and Hudson spoke to Rutherford in the scope of their employment. *See Oki Am., Inc. v. Microtech Intern., Inc.*, 872 F.2d 312, 314 (9th Cir.1989) (proponent of evidence has

---

**4.** Hawaiian Cruises argues that Kauhi, Ruben, and Hudson were not its "agents." Sana does not claim that they are. Rather, he correctly asserts that Sana's co-workers were "servants" of Hawaiian Cruises.

the burden of proof and must lay appropriate foundation). We conclude from the record that Sana's co-workers were acting within the scope of their employment. *Vaughan* and its progeny require shipowners to investigate a seaman's claims for maintenance and cure. Also, Hudson had an independent duty to monitor and report any injuries or illness among his staff. In all likelihood, Sana's co-workers would have been disciplined had they refused to share information with their employer's insurance investigator. The fact that the interviews were conducted on company time supports this view.

■ Sana argues that Rutherford's recorded version of the employee statements is an admissible business record under Fed.R.Evid. 803(6), which excepts from the hearsay rule

> [a] ... report ... of acts, events, [or] conditions ... made at or near the time by ... a person with knowledge, if kept in the ordinary course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... report ... unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness.

He claims that Rutherford's information gathering was a "regularly conducted business activity" on behalf of Beaudry Insurance. He also notes that the report was compiled on March 17, "at or near the time" of the recorded "events." Finally, Sana argues that the report is trustworthy, since Hawaiian Cruises had no incentive to generate evidence that he became ill at work.

Hawaiian Cruises argues that the Rutherford report is an accident report prepared in anticipation of litigation, and therefore it is not admissible as a business record. *See Palmer v. Hoffman*, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645 (1943) (court properly barred defendant railroad from introducing engineer's internal accident report). It also claims that since Rutherford was investigating whether Sana had suffered a head injury aboard the Navatek I, his report is not trustworthy to show that he manifested signs of encephalitis there. Finally, Hawaiian Cruises points out that for a business record to be admissible, each contributor must act in the regular course of business. *See United States v. Pazsint*, 703 F.2d 420, 425 (9th Cir.1983) (court improperly admitted routinely recorded 911 tapes because callers had no duty to report information); *see also Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir.1981) (purported business records "are admissible only if the observer or participant in furnishing the information to be recorded was acting routinely, under a duty of accuracy, with employer reliance on the result, or ... in the regular course of business.") (citations omitted). Hawaiian Cruises argues that Kauhi, Ruben, and Hudson were not acting within the regular course of the vessel's business when they spoke to Rutherford.

■ At oral argument, it became clear that this issue was not well presented to the district court. We are obligated, however, to make an independent analysis of the record and relevant authority. We conclude that the Rutherford report qualifies as a business record under Rule 803(6). Although Rutherford may have interviewed Sana's co-workers in anticipation of a potential claim, the rationale for excluding such reports is not present here. Courts are rightfully wary when parties create self-serving documents and seek to offer them as business records. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258–59 (9th Cir.1984). Sana, however, sought to introduce a document created by Hawaiian Cruises' insurer, which had no incentive to gather evidence of Sana's illness.

Moreover, the report had other "circumstantial guarantees of trustworthiness." *See United States v. Scholl*, 166 F.3d 964, 978 (9th Cir.1999) (citation and internal quotation marks omitted). Rutherford had a duty to prepare an accurate report

for Beaudry Insurance, which presumably relied on that report to adjust Sana's claim. *See id.* Likewise, in light of Hawaiian Cruises' obligation to investigate claims for maintenance and cure, Kauhi, Ruben, and Hudson had a duty to report accurately any information relevant to such claims. *Cf. Pazsint,* 703 F.2d at 424.

 Although it is unlikely that Sana's co-workers dealt frequently with an insurance investigator, frequency need not be the only consideration when analyzing the meaning of "routinely" and "in the regular course of business." Webster's defines "routine" as "a regular course of procedure." WEBSTER'S NEW COLLEGIATE DICTIONARY 1000 (1979). Although "regular" can mean "recurring ... at fixed or uniform intervals," it can also mean "usual" or "ordinary." *Id.* at 966. Here, the shipowner's duty to investigate a seaman's injuries—and the employees' corresponding duty to cooperate in the investigation—drive the analysis of what is "regular." Fulfilling these obligations is a "usual" or "ordinary" fact of life for the maritime industry, which has the unique responsibility of providing maintenance and cure to injured workers. Thus, the contributions of Kauhi, Ruben, and Hudson to the Rutherford report were "routine" and "in the regular course of business." This conclusion is bolstered by the fact that the interviews were conducted on company time.

### III. Did the court err by allowing Hawaiian Cruises to amend its answer?

 Under 46 U.S.C.App. § 183(a), a shipowner may limit its liability to the value of the owner's interest in the vessel. Under 46 U.S.C.App. § 185, the owner must petition the court for such limitation of liability "within six months after a claimant shall have given to or filed with [him] written notice of claim." Sana points out that he first demanded maintenance and cure of Hawaiian Cruises on August 8, 1995. He argues that this demand trig-

gered the six month period for seeking limitation of liability. Since Hawaiian Cruises did not assert this defense until January 14, 1997, Sana claims that it is barred.

Whether the time limitation in § 185 applies to an answer's assertion of the defense in § 183(a) is a question of first impression in this circuit. Several other circuits have concluded that it does not. *See, e.g., Signal Oil & Gas Co. v. Barge W–701,* 654 F.2d 1164, 1173 (5th Cir.1981); *The Chickie,* 141 F.2d 80, 85 (3rd Cir. 1944); *Murray v. New York Cent. R.R. Co.,* 287 F.2d 152, 153–54 (2nd Cir.1961). In *Murray,* the court noted that the plaintiff controls the timing of the lawsuit. *See id.* If the time limitation applied to answers, the defendant would have to bring a § 185 action within six months of a claim without knowing whether the plaintiff intended to sue. *See id.* This would be undesirable.

Like the other circuits that have examined this issue, we conclude that the time limitation in § 185 does not apply in these circumstances. The court did not err in allowing Hawaiian Cruises to amend its answer.

### CONCLUSION

 The court's refusal to allow Sana to introduce the Rutherford report through Beaudry was an abuse of discretion. The exclusion of this report materially affected Sana's case. Because the outcome may have been different if the report had been admitted, Sana is entitled to a new trial. *United States v. Nuesca,* 945 F.2d 254, 259 (9th Cir.1991). Because we so hold, we need not and do not decide whether Sana was answerable to the call of duty when he left the Navatek I. We REVERSE and REMAND for further proceedings.