# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

LAWRENCE COHEN,
        *Defendant-Appellant.*

06-10145
D.C. No.
CR-04-00119-KJD

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

IRWIN A. SCHIFF,
        *Defendant-Appellant.*

No. 06-10199
D.C. No.
CR-04-00119-KJD

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

    v.

CYNTHIA NEUN,
        *Defendant-Appellant.*

No. 06-10201
D.C. No.
CR-04-00119-KJD
OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
November 5, 2007—San Francisco, California

Filed December 26, 2007

16705

Before: Sidney R. Thomas, Richard C. Tallman, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Tallman

## COUNSEL

Chad A. Bowers (argued), Las Vegas, Nevada, for appellant Lawrence Cohen.

Michael V. Cristalli (argued), Las Vegas, Nevada, for appellant Cynthia Neun.

Sheldon R. Waxman (argued), South Haven, Michigan, for appellant Irwin Schiff.

Mark Determan (argued), United States Department of Justice, Tax Division, Washington, D.C., for the appellee.

## OPINION

TALLMAN, Circuit Judge:

These consolidated appeals follow the convictions and sentences of a well-known recidivist tax protestor, Irwin Schiff, and two of his acolytes, Cynthia Neun and Lawrence Cohen. After Schiff's last release from prison in 1991 for income tax evasion, he opened a store in Las Vegas, Nevada, where he sold books, audio tapes, videos and instructional packages, many created by him, explaining how to "legally stop paying income taxes."[1] Cohen and Neun worked at the store, and, together with Schiff, they provided "consultation services" to clients who wished to avoid paying federal income taxes. They encouraged their clients to file "zero returns," federal individual income tax returns containing a zero on every line related to income and expenses, and, in most cases, seeking

---

[1]In *United States v. Schiff*, 379 F.3d 621, 630 (9th Cir. 2004), we upheld a preliminary injunction on the sale of a book authored by Schiff, *The Federal Mafia: How the Government Illegally Imposes and Unlawfully Collects Income Taxes*, finding that it constituted fraudulent commercial speech.

an improper refund of all federal income taxes withheld during the tax year for which it was filed.

Following a twenty-three day joint trial in which Schiff represented himself, the jury returned guilty verdicts with respect to many of the counts in the indictment. In particular, Cohen was convicted of one count of aiding and assisting in the filing of a false federal income tax return in violation of 26 U.S.C. § 7206(2), for which he received a thirty-three month sentence.[2] At trial, the district court summarily convicted Schiff of fifteen counts of criminal contempt pursuant to 18 U.S.C. § 401[3] based on his unruly courtroom behavior. Schiff's total sentence for those convictions was twelve months in prison to be served consecutively to his tax evasion and conspiracy sentence.

Cohen argues that his conviction must be overturned because the district court wrongfully excluded the expert testimony of his psychiatrist who would have offered evidence of

---

[2]Schiff was convicted of conspiracy to defraud the government for the purpose of impeding and impairing the Internal Revenue Service in violation of 18 U.S.C. § 371 (also known as a "*Klein* conspiracy"; *see United States v. Klein*, 247 F.2d 908 (2d Cir. 1957)); five counts of aiding and assisting in the filing of false federal income tax returns in violation of 26 U.S.C. § 7206(2) ("aiding and assisting"), one count of tax evasion in violation of 26 U.S.C. § 7201, and six counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1). Neun was convicted of one count of conspiracy, nine counts of aiding and assisting, three counts of willfully failing to file income tax returns in violation of 26 U.S.C. § 7203, one count of social security disability fraud in violation of 42 U.S.C. § 408(a)(3), and one count of theft of government property in violation of 18 U.S.C. § 641. In an accompanying memorandum disposition filed contemporaneously with this opinion, we affirm Schiff's convictions and his resulting 151-month sentence. We also affirm Neun's convictions. She does not challenge her sentence on appeal.

[3]18 U.S.C. § 401 states, in relevant part, "A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as — (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice . . . ."

Cohen's mental state. We agree, and we reverse Cohen's conviction, vacate his sentence, and remand for a new trial.

Schiff challenges the contempt convictions and the resulting sentences. We vacate the contempt convictions due to the district court's failure to properly file contempt orders for each of those convictions as required by Federal Rule of Criminal Procedure 42(b) and our precedent. We remand to allow the district court to file those orders in proper form, to then reinstate the contempt convictions and reimpose punishment for Schiff's contumacious behavior.

I

A

Schiff's convictions for criminal contempt arose primarily from his refusal to heed repeated warnings by the trial judge to cease arguing to the jury his erroneous views of the law. Schiff often instructed witnesses to read passages from his books explaining his characterization of the voluntary nature of the federal income tax. For example, one witness read, "There is no question that it is . . . all correct. Paying and filing income tax[ ] are, by law, voluntary." Schiff frequently couched misstatements of the law in questions to witnesses. For example, Schiff asked one witness, "Were you aware that none of those sections [of the Internal Revenue Code] said you . . . were required to file a tax return?" On another occasion, Schiff asked a witness whether she was aware that "there's no provision in the law that allows the IRS to put on liens[.]" Schiff also asked a witness whether a passage from one of Schiff's books "tr[ies] to establish the fact that income in the ordinary sense is not exactly income in the tax sense." Schiff's defiance also took the form of his persistent refusal to cease particular lines of questioning after the district judge had previously ruled them improper and misleading.

During the first eight days of trial, the district judge dealt with Schiff's misconduct by sustaining the government's

objections and sometimes explaining to Schiff the legal basis for doing so. Schiff nonetheless persisted. On the ninth day of trial, following yet another transgression, the district judge warned Schiff at a sidebar conference that if his insolence continued, he would risk a contempt citation and sanctions.

Schiff still did not heed the warnings. The next day, Schiff suggested to the jury during his questioning of a witness that the law does not prohibit the concealment of one's assets from the government. He also improperly suggested that the government lacked the power to investigate criminal violations of the Internal Revenue Code. He continued to ask similar questions even after two objections by the government were properly sustained.

At that point, the understandably exasperated district judge summarily held Schiff in criminal contempt and sentenced him to one day in jail, "deferred until the conclusion of this trial. The next time it will double and it will continue to double until you . . . respect the rulings of the Court." Despite fair warning as to the consequences of persisting in this manner, Schiff's contumacious behavior continued, and he was thereafter sanctioned fourteen more times during the trial. On each of these occasions, the district judge simply stated "sanctions" so as not to "let the sanctions overly influence the jury."

At Schiff's post-trial sentencing hearing, the district judge reduced the sentence for ten of the fifteen sanctions to one month each:

> So, on the first sanction, it was one day; on the second sanction, it was two days; on the third, four days; on the fourth, eight days; on the fifth, sixteen days for a total of approximately one month cumulatively as of sanction number five.

> Thereafter, what I have decided to do is impose one month for each successive sanction resulting in a

total of twelve months as the sentence for contempt citations during trial.[4]

The district court briefly explained on the record its reasons for remitting this sentence, but did not file contempt orders for any of the convictions. Schiff was not afforded the opportunity to address the court with respect to his contempt convictions. Nor does it appear from the record that the court notified Schiff in advance of the sentencing hearing that his contempt convictions would be addressed.

B

Schiff raises three challenges to his contempt convictions and sentence. First, he argues that the district court erred by failing to file contempt orders as required by Federal Rule of Criminal Procedure 42(b). Second, he asserts that the sentence violates his right to due process under the Fifth Amendment because he did not receive notice or an opportunity to be heard at the post-trial sentencing hearing. Third, he maintains that the sentence violated his Sixth Amendment right to a trial by jury because his sentence exceeded six months. We address each of these arguments in turn.

1

We review summary contempt convictions for abuse of discretion. *United States v. Flynt*, 756 F.2d 1352, 1362 (9th Cir.), *modified*, 764 F.2d 675 (9th Cir. 1985). Federal Rule of Criminal Procedure 42(b) authorizes a district court to "summarily punish a person who commits criminal contempt in its pres-

---

[4]The district court made a mathematical error in calculating Schiff's punishment for criminal contempt. If the combined punishment for the first five contempt convictions totals thirty one days $(1 + 2 + 4 + 8 + 16 = 31)$, and the punishment for the remaining ten convictions are each one month, then the total punishment is eleven months, not twelve. We will discuss the implications of this error below.

ence if the judge saw or heard the contemptuous conduct *and so certifies* . . . . The contempt order must recite the facts, be signed by the judge, and be filed with the clerk." (emphasis added).

Here, the district court did not file the requisite contempt orders. The government argues that we should excuse the oversight because the district court "made the reasons for the sanctions abundantly clear on the record." The government relies on *United States v. Marshall*, 451 F.2d 372, 377 (9th Cir. 1971), for the proposition that the "[t]he function of the certificate [of contempt] is not to give notice to the defendant or to frame an issue to be tried, but solely to permit an appellate court to review the judge's action." In the government's view, where, as here, the district court enunciates on the record the basis for the summary contempt conviction, a separate certificate is not required.

**[1]** The government is mistaken. Our case law establishes that the district judge must file a contempt order setting forth in detail the factual basis of the contempt conviction and certifying that the district judge personally witnessed the conduct giving rise to the conviction. *See id.* at 374-75 (emphasizing that contempt orders are " 'more than a formality,' " and finding the contempt orders at issue insufficient because they contained "[c]onclusory language and general citations to the record"); *see, e.g., In re Contempt of Greenberg*, 849 F.2d 1251, 1254 (9th Cir. 1988) (rejecting the government's argument that the district judge's failure to certify that he " 'saw or heard' " the conduct giving rise to the contempt conviction could be cured by looking to the trial transcript and inferring that the court must have seen or heard the conduct). The government's recommendation that we forgive the district court's failure to issue contempt orders and accept oral findings as a substitute runs contrary to the explicit language of Rule 42(b) as well as every case of which we are aware to have considered this issue. *See United States v. Robinson*, 922 F.2d 1531, 1534-35 (11th Cir. 1991) (holding that a contempt order must

set forth the specific facts giving rise to the contempt); *United States v. Schrimsher*, 493 F.2d 842, 845 (5th Cir. 1974) (same); *Pietsch v. President of U.S.*, 434 F.2d 861, 863 (2d Cir. 1970) (same); *Tauber v. Gordon*, 350 F.2d 843, 845 (3d Cir. 1965) (same).

**[2]** We see no choice under our precedent interpreting Rule 42(b) but to vacate Schiff's criminal contempt convictions and remand to allow the district court to comply with the rule. In doing so, we understand the difficulty posed by an irascible *pro se* defendant like Schiff who presents himself in such a challenging manner to a trial judge who is earnestly attempting to maintain a fair and impartial trial through order and decorum in the courtroom. We remand to the district court to allow it to file the requisite fifteen contempt orders. *See Marshall*, 451 F.2d at 378; *United States v. Mars*, 551 F.2d 711, 715 (6th Cir. 1977); *United States v. Vano (In re Herbert Shafer)*, 496 F.2d 1195, 1196 (5th Cir. 1974). On remand, the district court may reinstate the contempt convictions and resentence him so long as it does not increase the individual punishments for any of the fifteen convictions. As discussed in footnote four, the district court made a mathematical error in computing Schiff's sentence, and using the district court's logic as to how the sentence was calculated, the correct sentence in total is not more than eleven months. The district court retains the discretion to impose the contempt sentence consecutively to Schiff's other sentences should it again choose to do so.

2

Next, we address Schiff's argument that his sentences for the contempt convictions were imposed in violation of his Fifth Amendment right to due process and Sixth Amendment right to a jury trial. The contours of Schiff's argument are less than clear. He seems to be arguing that, in effect, he was not summarily convicted and punished for criminal contempt fifteen times during trial, but rather, was cited fifteen times dur-

ing trial and, at the post-trial sentencing hearing, was given a single sentence exceeding six months.

In Schiff's view, where a person is cited for criminal contempt during trial but punished after, that person is entitled under the Fifth Amendment's Due Process Clause to notice and an opportunity to be heard at the sentencing hearing. Schiff also contends that where a person is given a single punishment for multiple acts of contempt, that person is entitled under the Sixth Amendment to a jury trial if the punishment exceeds six months. We do not disagree with those general legal propositions. *See Taylor v. Hayes*, 418 U.S. 488, 498-99 (1974) (holding that an attorney, who was cited for contempt during trial but was sentenced after the trial, was entitled to "reasonable notice of the specific charges and opportunity to be heard in his own behalf") (citing *Groppi v. Leslie*, 404 U.S. 496, 506 (1972)); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 832 (1994) ("If a court delays punishing a direct contempt until the completion of trial, . . . due process requires that the contemnor's rights to notice and a hearing be respected.") (citing *Taylor*, 418 U.S. at 498); *Codispoti v. Pennsylvania*, 418 U.S. 506, 517 (1974) (holding that the appellants were entitled to a jury trial where they were cited multiple times for criminal contempt during the trial, and given a sentence after the trial in excess of six months).

**[3]** However, we reject Schiff's premise based on his contention that he was cited during trial for contempt but convicted and sentenced after. The district court summarily convicted and sentenced Schiff at the time each of the fifteen separate contumacious acts occurred. The record clearly shows that Schiff was informed in advance of the progressive punishment that would be imposed for each repeated act in contempt of the district court's mid-trial rulings committed in the presence of the court and the jury. He was not entitled to relitigate his misbehavior after the trial because each mid-trial contempt conviction and sentence became final at the time the

contemptuous conduct occurred, and he was summarily sanctioned for it as the district judge tried as best he could to maintain order and coerce Schiff into complying with his rulings.

Schiff relies primarily on *Taylor v. Hayes*, 418 U.S. at 488. There, a state court judge "informed" an attorney nine times during a trial that he was in contempt of court, but did not sentence the attorney for those convictions until after the trial's conclusion, when he imposed a combined sentence of four and a half years in prison, though that sentence was ultimately reduced by about one year. *Id.* at 490-94. At the time of sentencing, the judge did not permit the lawyer to speak in his own defense. *Id.* at 490. On appeal, the lawyer contended that the due process clause entitled him to notice and an opportunity to be heard prior to final conviction and sentence. *Id.* at 496. The Court agreed.

The Court began its analysis by noting that the case before it did not involve the trial judge's exercise of his summary contempt power. *Id.* at 497 ("We are not concerned here with the trial judge's power, for the purpose of maintaining order in the courtroom, to punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him.") (citation omitted). The Court observed that

> [N]o sentence was imposed during the trial, and it does not appear to us that any final adjudication of contempt was entered until after the verdict was returned. It was then that the [trial judge] proceeded to describe and characterize petitioner's various acts during trial as contemptuous, to find him guilty of nine acts of contempt, and to sentence him immediately for each of those acts.

*Id.* The Court devotes the remainder of its opinion to explaining why, in the context of a non-summary contempt convic-

tion, the contemnor is entitled to "reasonable notice of the specific charges and opportunity to be heard in his own behalf." *Id.* at 499 (citing *Groppi v. Leslie*, 404 U.S. 496, 506 & n.11 (1948)).

Unlike the trial court in *Taylor*, the district court convicted and punished Schiff immediately as each act of contempt occurred. During the first eight days of trial, the district court warned Schiff innumerable times to obey court orders. On the ninth day, after Schiff continued to disregard the court's admonishments, the court explicitly held Schiff in criminal contempt and punished him immediately by imposing one day of incarceration. We have no difficulty concluding that this constituted a final adjudication and punishment for the first contumacious act that occurred in the court's presence.

**[4]** The closer question is whether the district court's simple utterance of the word "sanction" after each of the subsequent fourteen contumacious acts in an apparent attempt to prevent Schiff's contemptuous behavior from distracting the jury, constitutes a final adjudication and sentencing. We hold that it does. At the time of the first contempt conviction, the district court expressly provided Schiff with a formula for determining the punishment that would attach to further acts of contempt. Under that formula, he was fairly warned that the sentence imposed for each successive contumacious act doubled. The district court also informed Schiff at the time of the first contemptuous act that rather than bring the proceedings to a halt each time Schiff engaged in contempt of the court's rulings, the district court would simply state "sanctions." That word thus had a two-fold meaning: first, it meant that Schiff was being held in criminal contempt; second, it provided, based on the punitive formula previously announced, the specific punishment for each act of contempt. We see nothing wrong with a district court employing such progressive punishment and providing fair warning in advance to the contemnor in order to curb persistent misconduct and maintain order in the proceedings.

When the district court stated "sanctions," that word did not denote simply a citation whose implications would be discussed after trial in conjunction with other contempt citations. Rather, the district court treated each instance of contemptuous conduct as a "discrete and separate matter," *Codispoti*, 418 U.S. at 515, and punished each act at the time it occurred. Each conviction and each punishment attempted to serve the immediate and compelling need to preserve order and "prevent 'demoralization of the court's authority.' " *In re Oliver*, 333 U.S. 257, 275 (1948) (quoting *Cooke v. United States*, 267 U.S. 517, 536 (1925)). That it did not have the desired effect on Schiff is regrettable. But the manner in which the contempt and related punishment were imposed do not provide grounds upon which to excuse what he did in the face of fair warning.

Our conclusion is not altered by the fact that after the trial, the district court chose to reduce the respective punishments for ten of the contempt convictions to one month each. The function of that hearing was not to determine whether Schiff should be held in criminal contempt, and if so, to impose a sentence. Schiff had already been convicted and sentenced on fifteen separate occasions. Rather, the function of that hearing was to sentence Schiff for the guilty verdicts that the jury had returned on the tax and conspiracy counts charged in the indictment, to add up the fifteen contempt sentences Schiff had already received, and to determine whether the sentences should run concurrently or consecutively. The district court's discretionary decision to remit the punishments for some of those later mid-trial contempt convictions does not, in our view, bring this case into line with those such as *Taylor* and *Codispoti*, where the contemnor was cited during the trial, and the final decision of whether to hold him in criminal contempt, and if so, the punishment to be imposed for that crime, was deferred until the trial's conclusion. The concerns expressed in *Taylor* and its progeny about the "heightened potential for abuse posed by contempt power," *Taylor*, 418

U.S. at 500, are not implicated when a court reduces a constitutional, earlier-imposed sentence.

**[5]** In sum, we conclude that Schiff was summarily cited and contemporaneously sentenced fifteen separate times during the trial for criminal contempt. As a result, he was not entitled under the Fifth Amendment's Due Process Clause to additional notice or an opportunity to be heard with respect to contesting those convictions or the summary punishments imposed at the post-trial sentencing hearing. *See Taylor*, 418 U.S. at 498-99. Also, because none of the individual sentences exceeded six months, he was not entitled under the Sixth Amendment to have a jury determine his guilt before punishment was imposed on those contumacious acts committed in direct defiance of the trial judge's rulings. *See Codispoti*, 418 U.S. at 514 (noting that the right to trial by jury does not attach where a person is summarily convicted and sentenced during the trial on multiple occasions, as long as each sentence does not exceed six months).

## II

### A

The more troublesome issue we address concerns the district court's handling of proffered expert psychiatric evidence on behalf of appellant Cohen in the face of our precedent. On June 14, 2005, Cohen's lawyer filed a notice, pursuant to Federal Rule of Criminal Procedure 12.2, that he intended to offer expert testimony by psychiatrist Dr. Norton A. Roitman relating to Cohen's "mental disease . . . bearing on . . . the issue of guilt." Attached to that notice was a report prepared by Dr. Roitman, who had met with Cohen on two occasions at the request of Cohen's attorney.

In the report, Dr. Roitman diagnoses Cohen as suffering from a narcissistic personality disorder, and concludes that Cohen "did not intend to violate the law, as would be the case

with a criminal who acted out of a desire for personal gain" but rather "[h]is behavior is driven by a mental disorder as opposed to criminal motivation . . . Although it is true Mr. Cohen was not delusional or psychotic and was in possession of basic mental faculties, his will was in the service of irrational beliefs as a result of narcissistic personality disorder." The report also notes that

> Because [Cohen's] beliefs are fixed and have led him to significant adverse consequences, he is irrational to the point of dysfunction, demonstrated by his stubborn adherence in the face of overwhelming contradictions and knowledge of substantial penalty. . . . Despite evidence to the contrary, his psychological needs dominated his mentation. . . . This is the nature of the narcissistic personality in which the sufferer could essentially pass a lie detector test when asked commonsensical questions while giving improbable answers.

The government moved to bar Dr. Roitman from testifying and the district court agreed, reasoning that Dr. Roitman failed to explain "how the alleged mental disorders negate mens rea. Rather, [his] opinion[ ] merely explain[s] or justif[ies] [Cohen's] conduct."

### B

"We review for abuse of discretion a district court's decision to admit or exclude scientific evidence." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) (citation omitted). "A district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts." *United States v. Campos*, 217 F.3d 707, 710 (9th Cir. 2000) (citation omitted).

C

**[6]** Federal Rules of Evidence 702 and 704(b) govern the admissibility of Dr. Roitman's testimony, and we examine the exclusion of his testimony under both of these rules.[5] *See, e.g., Finley*, 301 F.3d at 1012-16 (examining the district court's decision to exclude expert testimony from the defendant's psychologist under Rules 702 and 704(b)); *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997) (en banc). "If the evidence could have been excluded under either rule, the district court did not abuse its discretion." *Morales*, 108 F.3d at 1035.

1

**[7]** The threshold issue is whether Dr. Roitman's testimony would have assisted the trier of fact within the meaning of Rule 702. According to Cohen, Dr. Roitman's testimony would have bolstered the contention that Cohen had a good faith belief that he was acting in accordance with the law, thereby negating the *mens rea* element of 26 U.S.C. § 7206(2), which requires that a defendant "[w]illfully"[6] assist in the filing of a false return. *See Cheek v. United States*, 498 U.S. 192, 201 (1991) (holding that a defendant cannot be convicted of violating a federal tax law if he harbors a good faith belief that he was not violating any of the provisions of the

---

[5]Rule 702 provides, "If scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Rule 704(b) prohibits the expert from offering "an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."

[6]"Willfulness requires that an act be done knowingly and intentionally, not through ignorance, mistake or accident." *Morales*, 108 F.3d at 1037 (citing *Ninth Circuit Manual of Model Jury Instructions - Criminal,* 5.05 (West 1995)). That is, Cohen had to *know* that the tax returns he assisted in filing were false. *Id.*

tax laws). The government counters that Dr. Roitman's report was irrelevant because nothing in it suggested

> that defendant was not capable of forming the requisite *mens rea* for the charged offenses. On the contrary, as the District Court found, Dr. Roitman's report did no more than explain why defendant intentionally violated his known legal duties. The report does not remotely suggest that defendant lacked the mental aptitude to understand his legal duties or the ability to act volitionally.

Cohen argues that *United States v. Finley*, 301 F.3d at 1000, controls and we agree. There, Finley was seeking funding to open a chain of bookstores when he met Leroy Schweitzer, a supposed investment guru who claimed to have recorded liens against various banks which could be drawn upon by the issuance of certain negotiable instruments. *Id.* at 1002-03. Schweitzer gave Finley several of these bogus instruments, claiming that they were worth nearly seven million dollars. *Id.* at 1003. Every institution presented with one of these instruments refused to honor it, including the IRS. *Id.* at 1003-04. Finley persisted in attempting to pay off his tax debt with these instruments, and he was eventually prosecuted for, *inter alia*, making a false claim against the United States in violation of 18 U.S.C. § 287. *Id.* at 1002, 1004. At trial, the district court excluded under Rule 702 testimony from Finley's psychologist that Finley lacked the intent to defraud due to his delusional disorder "in which . . . information from the real world . . . is so grossly distorted that the person ends up with" bizarre, irrational and fixed beliefs. *Id.* at 1006 (internal quotation marks omitted).

We reversed, reasoning that the excluded testimony

> would have offered an explanation as to how an otherwise normal man could believe that these financial instruments were valid and reject all evidence to the

contrary. While Finley could and did testify about how and why he believed the instruments were valid, only a trained mental health expert could provide a counterweight to the government's allegations against Finley.

*Id.* at 1013.

**[8]** The facts in *Finley* are strikingly similar to those in the present case. Schweitzer convinced Finley that certain financial instruments were genuine; Schiff convinced Cohen that one could legally submit a zero return. Expert testimony proffered by Finley and Cohen suggested they had a tendency to cling doggedly to their beliefs even in the face of overwhelming contradictions. The *Finley* court determined that the expert testimony could have helped the defendant counter the government's argument that he knew the financial instruments were false; similarly, Dr. Roitman's testimony would have helped Cohen counter the government's suggestion that Cohen knew the zero returns were false.

**[9]** We disagree with the government that Dr. Roitman's report can only be read to mean that Cohen knew what he was doing was wrong but did it anyway. In fact, the opposite is true: a fair reading of Dr. Roitman's report suggests that once Cohen adopted Schiff's views, Cohen would not change his mind. The report specifically states that Cohen "did not intend to violate the law." If Dr. Roitman had been allowed to testify to that effect, his testimony would have assisted the trier of fact within the meaning of Rule 702.

The government's reliance on *United States v. Scholl*, 166 F.3d 964, 970 (9th Cir. 1999), is misplaced. There, a defendant charged with filing false tax returns argued that the district court had erred in excluding under Rule 702 the testimony of an expert on compulsive gambling who would have testified that pathological gamblers, like the defendant, "have distortions in thinking and 'denial,' which impact their

ability and emotional wherewithal to keep records." *Id.* We affirmed, noting that there was no evidence presented at the *Daubert* hearing that addicted gamblers were incapable of truthfully reporting their gambling income. *Id.* "[E]vidence that compulsive gamblers are in denial . . . would not tend to show that Scholl did not believe his tax return to be correct . . . ." *Id.* at 971.

*Scholl* is easily distinguishable from the present case. According to his expert's report, a narcissistic personality disorder like Cohen's can cause a person to continue to believe something to be true despite overwhelming evidence of its patent absurdity. By contrast, there was no evidence in *Scholl* that an addiction to gambling could cause a person to believe that a false tax return omitting winnings was true.

Neither *United States v. Byers*, 730 F.2d 568 (9th Cir. 1984), nor *United States v. Demma*, 523 F.2d 981 (9th Cir. 1975) (en banc), require a different conclusion. In both cases, we upheld the exclusion of psychiatric testimony offered to negate the defendant's *mens rea* due to the " 'wide latitude [afforded to the district court] in admitting or excluding psychiatric evidence directed to the capacity of a defendant to entertain a specific intent.' " *Byers*, 730 F.2d at 571 (quoting *Demma*, 523 F.2d at 986). In *Byers*, the psychiatric testimony was "ambiguous" and would not "have materially assisted a jury in determining whether Byers committed a voluntary, intentional violation of known legal duty." *Id.* (citations omitted). By contrast, there is no such ambiguity in Dr. Roitman's report. The only question, which we discuss below, is how far Dr. Roitman should have been permitted to go in explaining his expert conclusions as they related to Cohen's ability to form the intent to evade the tax laws.

2

**[10]** Rule 704(b) is a limitation on Rule 702. Even if expert testimony would "assist the trier of fact" within the meaning

of Rule 702, such testimony may be excluded under Rule 704(b) if the testimony "state[s] an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged . . . ." Fed. R. Evid. 704(b). With respect to the type of inference precluded under Rule 704(b), the court has stated that the expert may not "draw[ ] an inference which would necessarily compel the conclusion" that the defendant lacked the requisite *mens rea*. *Morales*, 108 F.3d at 1037.

*United States v. Morales*, 108 F.3d at 1033, and *United States v. Finley*, 301 F.3d at 1016, serve as persuasive authority. In *Morales*, the defendant was charged with willfully making false entries in a union ledger in violation of 29 U.S.C. § 439(c). 108 F.3d at 1033. At trial, a key issue was "whether her admitted bookkeeping inaccuracies were intentional or were the result of her ignorance of proper bookkeeping procedures." *Id.* at 1034. In support of her argument that the errors were not willful, Morales proffered expert testimony from a certified public accountant who would have testified regarding Morales's poor level of knowledge and understanding of bookkeeping principles. *Id.* The district court excluded the evidence under Rule 704(b) but we reversed, reasoning that the expert "was not going to state an opinion or draw an inference that Morales did not intend to make false entries. Rather, she was going to state her opinion as to a predicate matter — that Morales had a weak grasp of bookkeeping principles. . . . Even if the jury believed . . . [the expert], the jury would still have had to draw its own inference from that predicate testimony to answer the ultimate factual question." *Id.* at 1037.

In *Finley*, we concluded that the psychologist's testimony did not violate Rule 704(b) because

> The jury could have accepted the atypical belief diagnosis and still concluded that Finley knowingly defrauded the banks. If credited, [the expert's] testi-

mony established only that Finley's beliefs were rigid and he would distort or disregard information that ran counter to those beliefs. [The expert] did not, and would not be allowed to, testify about Finley's specific beliefs with regard to the [bogus] financial instruments. The jury was free to conclude that Finley knew the notes were fraudulent, despite the rigidity of his belief system.

301 F.3d at 1015-16.

**[11]** We have little doubt that if Dr. Roitman had been permitted to testify as to all of the conclusions contained in his report, some of that proffered testimony as contained in his report would have invaded the province of the jury and violated Rule 704(b). However, the best way for the district court to have insured the exclusion of the potentially inadmissible aspects of Dr. Roitman's testimony was not to bar him from testifying altogether, but to sustain the government's objections to particular questions likely to elicit inadmissible evidence under the rule. The district court also could have discussed with the parties before he testified the limits that would be imposed on the scope of Dr. Roitman's testimony. *See Finley*, 301 F.3d at 1005.

If the district court had followed that course of action, then Dr. Roitman's testimony, like the expert testimony at issue in *Morales* and *Finley*, would have gone to a predicate matter — whether Cohen suffered from a Narcissistic Personality Disorder. Even if the jury had accepted this diagnosis, the jury would still have been required to determine what impact, if any, that condition might have on Cohen's ability to form the requisite *mens rea* — the intent to evade the tax laws. As in *Finley*, the jury could have accepted the Roitman diagnosis but determined nonetheless that Cohen knew the zero returns were false.

The government relies on *United States v. Campos*, 217 F.3d at 710-12, in which we affirmed a decision to exclude

testimony by the defendant's expert polygraph examiner that the defendant did not know that she was transporting marijuana into the United States. Such testimony, according to the *Campos* court, "falls squarely within the scope of Rule 704(b)" because, if the testimony was credited, it "necessarily follows" that the defendant lacked the requisite *mens rea*. *Id.* at 711.

*Campos* is easily distinguishable. If Dr. Roitman's testimony was limited in the manner described above, the jury could still have concluded that Cohen knew the zero returns were false but chose nevertheless to assist others in filing them. But in *Campos*, if the jury believed the polygraph expert, the conclusion that the defendant lacked the requisite *mens rea* was inescapable.

3

**[12]** The government argues that even if Dr. Roitman's testimony was admissible under Rules 702 and 704(b), it should have been excluded under Rule 403.**⁷** We disagree. Dr. Roitman's testimony would have been highly probative on the issue of whether Cohen could have formed the requisite *mens rea,* and was unlikely to cause significant confusion with the jury if properly constrained by compliance with the rules of evidence.

4

"Under our test for nonconstitutional error, which we apply to errors as to the admissibility of expert testimony, we must reverse unless it is more probable than not that the error did not materially affect the verdict." *United States v. Rahm*, 993 F.2d 1405, 1415 (9th Cir. 1993) (citation omitted).

---

**⁷**Federal Rule of Evidence 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

**[13]** The court in *Finley* concluded that the exclusion of the expert's testimony was not harmless because that testimony was "essential to the defense." 301 F.3d at 1018. "Finley's counsel did not have any other way of explaining the possibility that Finley suffered from a mental disorder." *Id.*; *see also Morales*, 108 F.3d at 1040 (holding that the wrongful exclusion of the defendant's expert witness who would have offered evidence that the defendant lacked the requisite *mens rea* was not harmless error); *Rahm*, 993 F.2d at 1415 (concluding that the wrongful exclusion of the defendant's expert witness, a psychologist who would have testified that the defendant suffered from "perceptual difficulties" and was therefore less likely to know that the currency in question was counterfeit, was not harmless error). Likewise, the exclusion of Dr. Roitman's testimony left Cohen without any way to explain the effect that his mental disorder may have had on his ability to form the requisite *mens rea*. We therefore reverse Cohen's conviction, vacate his sentence, and remand for a new trial.

## III

Schiff's criminal contempt convictions are vacated, and the case is remanded to allow the district court to file the requisite contempt orders pursuant to Federal Rule of Criminal Procedure 42(b). Any sentence reimposed must not exceed eleven months. The district court retains the discretion to impose the contempt punishment to run consecutively to the sentence for the tax convictions. Cohen's conviction is reversed, his sentence vacated, and the case is remanded for a new trial. The remaining issues are addressed in the accompanying memorandum disposition.

AFFIRMED in part, REVERSED in part, and REMANDED.